Good morning, Your Honors. Mark Vanderhout, appearing with Elise Shugel on behalf of Petitioner Sami Zabadi, who's present in court today with his wife and children, and they will be leaving to not disturb the court. Three days after 9-11, Mr. Zabadi, a Palestinian, was convicted of violating California Penal Code Section 288. Though he has steadfastly maintained his innocence, and it may be notable that the State court judge essentially served him to time served, 311 days, nonetheless, he recognizes that he stands before this Court, as he did before the immigration judge and the Board of Immigration Appeals, convicted of that offense. The Immigration Act — I just want to ask you one question out of curiosity about the offense. I'm sorry, Your Honor. I said I want to ask you one question out of curiosity — Yes. Not because it has any effect, but as I noticed in the divorce proceeding, a divorce was granted on the basis of mental problems? Yes, Your Honor. There is evidence — Which party in the divorce had the mental problems? Well, the evidence in the record below was that the wife was experiencing hallucinations, and that was presented to the State court, and it was presented to the court, the immigration court also, the mental instability of the wife. And that's stated in the administrative record in 2350, if the Court wants to refer to that. Is there any finding on that? Well, an annulment was granted, but there was no finding on that, no, particularly. That was the basis for the divorce in the State court? I haven't reviewed all the State court filings on the divorce, but that was the stated basis, correct. Thank you. Notwithstanding the conviction, the Immigration Act does allow for waivers of admissibility for someone convicted of this offense. Mr. Zabadi sought and was granted that waiver by the immigration judge, who heard the evidence in the case and issued a ten-page, single-page decision analyzing the overwhelming equities as well as the offense before granting relief. The BIA, however, in a one-and-a-half-page decision with a total of two sentences devoted to the offense, reversed the immigration judge's grant of relief in what it stated was the exercise of discretion, but in reality was a decision based solely on the fact of the conviction and Petitioner Asserts, DHS's Operation Predator program. And we know that because? Well, there's two aspects. On the decision itself, the Board says, and this is at 808 of the administrative record, that the he would say they convicted of the offense and that while we recognize that an expert witness testified it is unlikely the Respondent would commit a sex offense in the future. I can't understand. Could you start reading again? Oh, I'm sorry. I'm sorry. In 808, the first Board decision, and there's two decisions now that the Court's reviewing, the first decision, which essentially overturned the grant of relief, and then the second decision, which was a designation issue. It states the fact of the conviction, the fact of the expert's testimony does not diminish the extremely serious nature of the offense. And then it states the offense is the nature of a sexual offense against a child. We submit to the Court that just as Judge Reinhardt, you wrote in the Yepis Prado decision, where the Board looked at drug dealing and said we think this offense deserves to be, had relief denied, that the Board didn't give an individualized consideration to the case. It took the fact that there was a sex offense and denied relief. So we think the Court could remand based on Yepis Prado alone. But if your question, I'm sorry. Where do you allege anything that the Board did not give individualized and impartial consideration in this case? I'm sorry. I mean, I looked all through your brief to try to figure out where you allege that the Board didn't give individualized and impartial consideration. In the Yepis, where we cite to the Yepis Prado decision, Your Honor, we state that the Board had to consider the fact and weigh that, and that they didn't do that. And we cite Yepis Prado for that proposition. But did the BIA apply the proper legal standard in this case? No, we believe it didn't. We believe just like it. What was the legal standard it was to apply? It was to consider all the equities, decide the, it can examine the offense, obviously. It can look at the offense. But it can't just look at the offense. It has to look at the equities, and it has to balance that. And we think like the Board did in Yepis Prado, it just took the fact of the offense itself. But we have more evidence than that, and I'm not sure if that was what your question was going to, Your Honor, which is on goes to the transfer issue. On that issue, if the Court believes that there's not sufficient evidence to remand under Yepis Prado, then we believe at a minimum there's clearly material, there's a genuine issue, material fact based on the overwhelming evidence we submitted with the motion to transfer. In that, we have a multitude. I'm sorry, Your Honor. I don't think you want to ask a question. We have a multitude of evidence. I'm sorry. I thought someone was trying to speak, so if I was speaking over them, I will. I do have a request, and that is that you back away from the mic about two or three more inches, because we're getting a bounce back. You have a good, strong voice, and it's, we're getting a feedback on it. Okay. So I'd like to go through the evidence in the motion to transfer. The evidence there of EOIR bias was, first of all, in the statistics. The statistics showed that overall, waivers in sex offenses were granted at a rate almost four times higher before Operation Predator than after Operation Predator. And wasn't, weren't these statistics in comparison analysis of I.J. decisions? We were. The statistician said there was insufficient numbers. Well, didn't they really look about I.J. decisions, not BIA decisions? In the FOIA litigation, we got both, but insufficient sampling for the expert to say, make conclusions. If we were remanded, I'm sorry, if we transferred this to court, we would have full discovery at that point and be able to get much more evidence. But the. I guess my worry is that given the evidence that I saw in the record, it seemed to me what you were really suggesting is that it was happening in BIA decisions, even, or excuse me, I.J. decisions, even if I thought the expert was competent. And in this I.J. decision, you got what you wanted. We're really talking about a BIA decision. We. Applying the legal standards that they were to apply and were to step back and say, based on what you've said in the motion to transfer, that we're to do something about that. That's correct, Your Honor. And the reason is it's a different standard than the motion to transfer. We just have to present enough factual evidence in the record for the court to determine that there's a genuine issue of material fact. And we think, whether it's BIA or I.J., they're both under the EOIR, they have the same director, and they're both influenced by the, by all the statements. The statements, the publicity, the assistant secretary of DHS stated that this program was the President's goal. It was the President of the United States who had this program and stated it's his goal to, to implement and try to remove from the country Operation Parameter. Another question. Do you have a good case for the idea that when one is making a discretionary decision, when it's absolutely in the discretion of the judge, that somehow we ought to go to a violation of due process or equal protection when it's a total discretionary decision? Yes, Your Honor, the Supreme Court's decision in Accardi is directly on point. In Accardi, the --- Do you think that's on point for this situation? I do, Your Honor, yes. In Accardi, the Attorney General was making statements that we have a list of unsavory characters, Mr. Accardi was on that, the Board of Immigration Appeals purported to balance the equities and deny suspension discretionary, and the Supreme Court said, look, when you have the executive branch making statements like this, like they've done in Operation Predator, that it's naive to think that the Board is going to say, well, we're denying because the Attorney General said so. Similarly, it's naive to say that, to think that the Board would say, well, we're denying because of Operation Predator. But the evidence of, there's meetings between DHS and the BIA on what to do about Operation Predator. There are pronouncements. There's, of what to do. DHS has access to the system of EOIR. They can access it and tell the Board, this is an automatic stay case, an Operation Predator case. The Board has stated they're going to rush these cases and they're going to track these cases and they're going to record what they're doing on these cases. The evidence is actually much more significant here than in Accardi. And you have all the public pronouncements also. What would this proceeding in district court be like? Would you envision taking the deposition of members of the Board? We might do that. We might give much more discovery on the BIA decisions. You know, I've never known a lawyer that was given broad discovery in a proceeding to back off what they wanted. I mean, if a district judge said, okay, you can depose members of the Board, would you? I am not positive whether we would or not, but we might possibly, Your Honor. We considered that in the court. We referred the court to the American Baptist Church litigation where we alleged that there was discrimination in BIA and IJ adjudications. That was precisely the issue. And the district court in that said that possibly might be appropriate for discovery. The case settled and so didn't have to go there. But I do think it is appropriate to talk about what sort of meetings were held, what sort of decision-making went on because of Operation Predator, and how does the fact that this is the President's goal influence them. How is this whole thing any different than a new prosecution team coming in with a new administration and changing their priorities? Because this is the executive branch saying this. The executive, the EOIR is under the executive branch. Okay. And you have the executive branch saying, we're going to deport. We have to deport all these people. It's a major priority of our administration to deport these people. And you have then the Board members who are under them making that decision. We think it's very similar to Riccardi. If I could spend, I want to hope. Let's see if I understand. Judge Harkin says that if an administration comes in and says we're going to prosecute drug peddlers. Drug traffickers. Drug traffickers, yes. And says to the U.S. attorneys, devote your resources to prosecuting drug traffickers. Is there some problem with that? No, I do not. But the difference is in Article III court. And that's the difference. You have the executive branch here, and that's what the Supreme Court in Riccardi said, where you have the executive branch making the orders to go after and deport these people, and the executive branch deciding that. It's unrealistic to think they won't be influenced. If I could briefly, I want to save a couple minutes for rebuttal. I just want to briefly address the designation issue. If the Court rejects our argument on the merits, which we hope it won't, but on the designation issue, we just want to point out that the DHS has taken the astounding position that it's free to put Mr. Zabadi or anyone else on a plane to anywhere in the world it wants without going to court to prove that that country will accept what is required by the regulation and the statute and having the immigration judge adjudicate whether or not that's proper, and even giving him an opportunity to claim asylum for that country. The Board of Immigration Appeals stated the DHS is free to do that, and we think this is reviewed by the Court and has to be reviewed. The danger would be here that if this case is not reversed on the merits and the Court doesn't address the designation issue, six months down the road, a year down the road, Mr. Zabadi can be put on a plane to Pakistan, Afghanistan, anywhere the DHS wants with no recourse to the courts to claim asylum. Scalia. What's our problem with waiting until this is ripe? I hate to even talk about that after yesterday, but what is our problem about waiting until this is ripe? I mean, there's nothing in this Board's order that does anything except what your client wanted, only to suggest that contingent there's something else that might be able to happen in the future, which hasn't happened. This is the only forum, however, to address it, because this is the only forum to address the Board's decision. The government will walk into court if we tried a habeas as the plane was at the airport and say this should have been done at the petition for review stage. 242G bars the review, which says you can't contest the removal except in petition review proceedings, and 242B-9 says that all issues have to be presented to the Court in the petition review stage. You've got to put the issue. Even if we said in our disposition in this case that the designation issue is not ripe and your client is free to pursue judicial relief upon a designation? Well, Your Honor, it's hard to imagine the actual circumstance that could even have the opportunity to go into court, because DHS's position is they could, in the middle of the night, put him on a plane to anywhere in the world, and without notice of him being able to go to court, without notice of him being able to contest that he be persecuted there, their position is they could whisk him away in the middle of the night and put him on a plane. There would be no recourse. 242 says this is a time to contest it because the Board said the DHS can do it. I see that I'm out of time. Maybe the Court will give me 30 seconds. Thank you very much. May it please the Court. I'm Jennifer Levings from the Department of Justice, representing the Attorney General in this matter. At the outset, Petitioner has not presented a colorable claim over which this – which would let this Court take jurisdiction over – over his issues. Even if he – and even if he had, transfer to district court would not be appropriate in this manner – in this matter, because the Court has enough before it in the five-volume record to determine whether or not the Board gave individual consideration to his claim. And here, the record is replete with evidence that the Board in this case did give individual and particularized consideration of his claim. I would like to just quickly address the question that you raised. You say particularized, but does the BIA opinion weigh the equities against the seriousness of the conviction? Yes, Your Honor. They do. The Board recognized the outstanding positive equities that Petitioner had presented, including his strong family ties, his work history, and the hardship his family would face if he was removed. But it found that the very serious nature of his conviction, which he was, in fact, convicted of molesting a 20-month-old baby who was in diapers, that that serious offense, that those positive equities could not and did not in this case, especially given that he had a special duty of care to the baby. It was his — and the Board recognizes it was his 20 — the 20-month-old niece — his 20-month-old niece. So that was an additional negative factor. May I ask you, did the Board take into account the — was there only one witness to this, his wife? To the actual crime? Yes. Yes, other than the baby, who was only 20 months old. And I would like to point out, you know, Petitioner has tried to make much of bias during his jury trial, given that he's Palestinian, and that this happened around September 11th. I would like to point out for the Court that there was a second victim, and the jury declared a — was hung on that charge. So they were able to — the jury — And was the wife the only witness to that one also? No, I believe there was a — the 7-year-old, there was — I think there was a video testimony or video. I think it was the video — videotaped interview of the 7-year-old child was presented, and I believe the defense in that case questioned the — was able to get enough of the jury to — And there was no conviction? There was no conviction on that. So there — you know, clearly, I think that goes to showing that, you know, not only did the appellate courts not buy off on his claim that he was — that the jury was biased because he was Palestinian, it was around September 11th, but the jury actually could not decide on the charge relating to the 7-year-old. So they did not automatically convict him of that. There was a hung jury on that issue. So — and this case has been litigated through the State courts. The State courts have affirmed the conviction. So he is a convicted child molester. I would note that the evidence before the immigration judge, he did put on a psychological — or I think a forensic psychologist who admittedly did not interview the victims or the mother of the victims, you know, only relied on the Petitioner's statements that his — the claims that the wife was crazy, which the jury did not seem to buy because they convicted him. I would also like to note that the divorce decree and the divorce documents in the administrative record do not indicate that the divorce was granted because the wife was — I think it was unstable. It's — I think what they do show, and I think these are AR-2670 through 7-1, they do show that it looks like she petitioned for divorce shortly after the — she found — she witnessed this crime. I think two months after. And it looks like it's an uncontested — the court acquired jurisdiction of it on February 15, 2001. So there was no — there's no evidence in the record that there was an ongoing divorce proceeding at the time these charges were brought or that the divorce was granted because she was in any way unstable. That's just not supported by the administrative record. So our position is that there is not a colorable claim of bias in this case. I think the — he cannot show that the jury was biased. He can't show that the I.J. was biased. The I.J. actually granted relief. I.J. granted everything that he requested, bond, relief. There was absolutely no forum shopping in this case. He — the record shows that he actually had a different immigration judge for his initial bond proceedings, and it was transferred back to the — to immigration judge, the more favorable immigration judge for his merits hearing. And that was at the request of his counsel that it went back to the original immigration judge. The DHS had actually requested that it stay with the new immigration judge, and that was declined. So it went back to the original immigration judge. So there's no forum shopping by the Department of Homeland Security in this case. Sotomayor, if you're done with that issue, can we turn to designation? If you're not, I don't want to interrupt your argument. No, no, sir. On the designation issue, do you think it's unripe? Yes, Your Honor. I think he has not suffered an injury. He did win below the board agreed with him and upheld the immigration judge's declination of the two new countries of removal. So all that we have on the table is Kuwait, and that's what he — you know, he won below. So there has been no injury, in fact. And there may never be another country designation. And if the panel were to agree that it's not ripe and wrote in its decision that he's free to seek judicial remedies in the event that designation changes, is counsel correct that the government would ignore that and swoop him up in the middle of the night and take him off to Afghanistan or Pakistan? No, Your Honor. At the outset, you know, hypothetically, if that were to happen, he would still — I mean, ICE cannot remove him to a country where he has a credible fear of torture if he did raise some sort of claim that he would be tortured. But how would he raise it if they picked him up in the middle of the night? There's — Where would he raise it? I'm sorry. Well, the statute prevents them from removing him to — I mean, there's no indication that they're going to pick him up in the middle of the night. I don't really know where that comes from. Well, they do pick people up in the middle of the night. Well, people who have — I mean, not on a new country designation where he hasn't had a chance to say whether he would be tortured. This would be a torture-only claim because he's not eligible for anything else. Would your client be prepared to concede that if the designation changes, he would have an opportunity to seek judicial relief within a reasonable time? What I can say is that I know that there's been talk about 242G barring any sort of district court suit. Our position is consistent that 242G — if he raised a constitutional claim such as no notice, no opportunity to be heard on this new country designation, we would not fight that. We don't believe that 242G — we believe that it allows for constitutional claims, and that's our office's position. So there would be a forum for him. Okay. Thank you. Absent any further questions, the government rests. Thank you. Thank you. You won 30 seconds. One minute. One minute. Okay. You're a good negotiator. You asked for 30 seconds. Whatever. We'll give you 45 seconds. Whichever. Two points. If the Court would say if the government agrees that on the designation issue it has to go back to the immigration judge on a motion to reopen, the Court, we would suggest put that in its decision. The government has agreed that there's a forum to do it. Henry says it's got to be before an immigration judge. So we would suggest a motion to reopen. Lastly, on the — whether there was activity, ex parte communication in this particular case, we believe there was, and the evidence shows that. In the record, the district court habeas case, the BIA issued its decision on the very morning — issued a decision on the merits on the very morning of the habeas litigation. DHS counsel was informed of that. We were not informed of that. DHS counsel used that to go into court and say there was no jurisdiction any longer. We think the evidence at least raises a reasonable evidence that there was coordination between the BIA and DHS on issuing its decision that day to affect the litigation in the habeas case. So that's in the record before the Court. Thank you. Thank you very much. The case just argued will be submitted.
judges: Reinhardt, Hawkins, Smith N. R.